John J. Duran, CSB#133166
Duran Law Group
9200 Sunset Blvd. Suite# 710
West Hollywood, California, 90069
(424) 777-0007
john@duranlawgroup.com

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br><br>       Plaintiff,<br><br>  vs.<br><br>JAMES GREGORY HARVEY<br><br>     Defendant. | Case No.:  2:15-cr-00476-PSG-1<br><br>**DEFENDANTS SENTENCING POSITION;STATEMENT IN SUPPORT OF VARIANCE**<br><br>   Date:  March 28, 2016<br>   Time: 10:00 a.m.<br>   Place: Roybal Courtroom 880<br><br>**Honorable Philip S. Gutierrez** |

     Defendant James Gregory Harvey, by and through his attorney of record, John J. Duran, hereby submits his Sentencing Memorandum,[1] setting forth the factors the Court should consider in determining what type of sentence is —sufficient, but not greater than necessary to comply with the statutory directives set forth in 18 U.S.C. §3553(a).

---

[1] *Mr. Roger Pimentel, a sentencing consultant, assisted in the investigation and preparation of this filing. Mr. Pimentel's Curriculum Vitae is attached as Exhibit E.*

# I.
## SUMMARY OF DEFENDANT'S SENTENCING MEMORANDUM

Mr. Harvey is prepared to accept the sentence the Court finds appropriate pursuant to the plea agreement filed in this case. Mr. Harvey also understands that accepting responsibility for his conduct will include incarceration in federal custody. Mr. Harvey, through his lawyer, moves the court to vary from the calculated guideline range of 97 to 120 months and impose a sentence of 12 months and 1 day,  with an appropriate term of supervised release, showing for good cause as follows:

### A. Procedural Posture

1.  Mr. Harvey is charged by Information with one count –  Possession of Child Pornography. Mr. Harvey was in possession of 3,000 images and 3 videos.

2. Pursuant to a written plea agreement Mr. Harvey entered a plea of guilty to the single count in exchange for the Government's agreement to, recommend a three level reduction at sentencing for acceptance of responsibility.  The Government and Mr. Harvey, have agreed to a Total Offense Level of 27 (PSIR at ¶ 3). The statutory maximum range of imprisonment for Count 1 is 10 years (PSIR at ¶ 82). A five year to lifetime period of supervised release is available. (PSIR at ¶ 85).

3. The Pre-Sentence Investigation Report (PSIR), pursuant to U.S.S.G. § 2G2.2 finds that the Total Offense Level is 30 and the Criminal History Category I. (PSIR at ¶ 38). The resulting recommended Guideline range of imprisonment is 97 to 120 months. (PSIR at ¶ 82).

4. Mr. Harvey moves the court to vary from the recommended range and sentence him to a "fair and just" custodial sentence, at or near 12 months, followed by an appropriate period of supervised release.

## B. Summary of the Argument

5. The Guidelines are advisory. *United States v. Booker*, 125 S. Ct. 738, (2005), *Gall v. United States*, 128 S.Ct. 586, 591 (2007). The properly calculated guideline range is not to be presumed reasonable by the district court. *Gall v. United States*. Recently, the child pornography guidelines have been criticized and scrutinized as the product of Congressional mandates with no empirical support or distinction for differences between offenders. *United States v. Grober, 624 F.3d 592 (3rd Cir.2010)*; United States Sentencing Commission, REPORT TO CONGRESS:CHILD PORNOGRAPHY OFFENSES (December 2012). This is contrary to the goals of sentencing expressed in 18 U.S.C. §3553.

6. Analysis of the facts of this case and application of §3553 factors favors a mitigated custodial sentence, at or near 12 months, and an appropriate term of supervised release.

7. James Harvey is a 62 year old man, who has pled guilty to one count of Possession of Child Pornography. Up until the present matter, Mr. Harvey's standing in society was distinguished. James was an accomplished banking professional who worked diligently for many years to climb the corporate ladder and reach the highest levels of the banking industry. *The present matter has resulted in the end of his banking career and voluntary resignation from his employer.* James Harvey, *a first time offender*, now faces a potential guideline sentence that could incarcerate him for years, if the Court follows a presently flawed guideline, and the recommended sentencing calculation of the probation office. He presently faces an advisory "low end" guideline range, that nears the statutory maximum of 97 months in custody.  Indisputably, the possession of child pornography is a very serious offense, as reflected by the potential penalties in such cases. However, as demonstrated below, on multiple levels, Mr. Harvey deserves a mitigated custodial sentence which will be sufficient to promote

the goals of sentencing. Also, such a sentence is not greater than necessary given the personal characteristics of the defendant.

8. The child pornography guidelines are unique to the extent that they have been so grossly increased in just recent years. As a result of the Protect Act, which was passed by Congress in April, 2003, the Guidelines added a greater base offense level; an enhancement for material portraying sadistic conduct, which can include any sexual intercourse with a prepubescent minor; and additional enhancements for larger quantities of images, and enhancements for using file sharing software as "distribution" with no need for the overt act of distribution to be an actual element of the offense. The impact on Mr. Harvey 's potential sentence is astronomical. The present-day flawed guideline attempts to quantify images and videos with arbitrary numbers in an effort increase penalties, without consideration of a defendant's potential risk to the community. Ironically, had Mr. Harvey actually engaged in sexual conduct with a minor under the age of 18, the Guidelines would advise that he be sentenced between 27 to 33 months. (See U.S.S.G. § 2A3.2(a)(BOL 18). Moreover, the guidelines do not correlate with present day technology, resulting in the gross over statement of an offenders conduct. As seen in the underlying matter, the effect of these enhancements on Mr. Harvey, *a first time offender*, is to make his calculated guideline guide line exposure range significantly more than it would have been under the 2002 guidelines and exposing him to a penalty near the statutory maximum. With no empirical evidence to support how these increased guidelines support the purpose of sentencing, it suggests, at the very least, that political forces, rather than analytical analysis, have entered the fray as to what constitutes "just punishment."

9. Since his initial contact with case agents, Mr. Harvey has been cooperative with law enforcement and the judicial system as evidenced by his immediate admissions and timely guilty plea. Mr. Harvey accepts responsibility and is sincerely remorseful. Letters of support (Exhibit A) describe an extraordinary man who has a sense of humor, strong work ethic, is kind, considerate and responsible, a devoted son, a thoughtful and loyal friend, a loving husband, and a man who always puts the needs of others first. These letters, written from the heart by family members, friends, former colleagues, and other loved ones, are the best evidence of Mr. Harvey's character.

10. Mr. Harvey poses no risk to the community. A psychosexual assessment by Dr. Lea Chankin, Ph.D (Exhibit B), a leading expert in sexual offenders reveals that Mr. Harvey is at the lowest level of recidivism risk, and amenable to future treatment in the community. Also, a validated risk assessment tool administered to Mr. Harvey (Exhibit C), similar if not identical to testing used by the Probation Office and the Bureau of Prisons to assess risk, further corrabarates that Mr. Harvey is at the very lowest risk of reoffending.

12.   Based on his lack of criminal history, his extraordinary work ethic, his unconditional acceptance of responsibility, his contributions to the community, and his minimal risk of recidivism, a mitigated custodial sentence coupled with stringent terms and conditions , including sex offender registration and on-going mental health treatment, would be sufficient to reflect the seriousness of the offense, to deter future crimes, to promote respect for the law, to protect the public and to provide just punishment for the offense as called for by *18 U.S.C. §3553 (a)(2)(A-D)*.

## II.
## THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT
### 18 U.S.C. § 3553(a)(1)

The following was compiled following extensive interviews with James Gregory Harvey[2], family members, and friends. Additionally, an in-depth investigation was conducted into Mr. Harvey's personal background and life history. This included a review of his employment records, medical records, and character reference letters (Exhibit A), which have been appended for the Court's consideration.

**The Early Years**

James Gregory Harvey was born on January 30, 1954, in Corona, California to the marital union of James and Shirley Harvey. He is the oldest of four siblings. Greg's father was a University of Arizona educated man, who also served his country in the United States Navy. With a background in engineering his father later worked for Goodyear Industries and Lockheed. His father was an integral figure in the design of 1960's space vehicles and ground missiles. Shirley, was a loving and nurturing mother who cared for Greg and his younger siblings. The nature of his father's work resulted in the young family moving with some frequency. Eventually, the Harvey's settled into the Phoenix, Arizona area. Phoenix was a growing community at the time. Early memories for Greg include a seemingly quiet childhood in which he attended neighborhood elementary schools. He remembers riding bicycles and playing in the neighborhood with friends. He was close with his siblings, but there was some age difference. Greg enjoyed participating in Boy Scouts and youth sports. Greg loved reading books and excelled in academics. Greg also developed a love for music and piano, at his mother's encouragement. Greg recalls his father was always a hardworking man.

---

[2] James Gregory Harvey is lovingly known as "Greg" by all that know him well.

His father was also a strict disciplinarian. There were always serious consequences for misbehavior or unsatisfactory school marks. Greg's mother Shirley was very involved with Greg and his siblings. She consistently volunteered in school and youth activities. She was probably overprotective of Greg, as he was the first born of the family. Within the home, and in retrospect Greg recalls a very structured and business-like environment in which good manners, excellent grades and respect to elders was all expected.  Summer vacations usually consisted of road trips to the Grand Canyon or the occasional camping trip. Greg also cherished a special relationship with his grandmother who instilled family traditions and important values like work ethic, honesty, and importance of family. Later in life, as Greg's homosexuality became revealed it was his grandmother who provided the love and support for him as other family members shunned him. Some of Greg's fondest memories are related to the holidays such as Thanksgiving and Christmas where extended family was always present and together. Greg describes his early childhood  as idyllic.

As much as the family and Greg loved the Phoenix area, relocation was necessary due to a job transfer for Greg's father. The family relocated to the San Jose area where the following years saw Greg's transition from child to young adult.

**The Confusing Adolescent Years and High School**

As Greg promoted to high school, his success as a student continued. He consistently made the honor roll and was finding that all areas of mathematics were of interest to him, while becoming his favorite subject. He also was involved as class president and excelled in track and field.

As Greg's adolescent years progressed, so did his internal struggles. This is the period in Greg's life in which his homosexuality became evident to him. Greg never really struggled

with the idea, as he recognized his sexual orientation from early puberty, but he often feared that his conservative family members would view him differently. Even though it was the late 1960's, homosexuality was far from being widely accepted. Greg dated girls during high school and even attended dances and proms, which ultimately made for very awkward events for him.  Repressing his sexual orientation during these years caused deep emotional scars and confusion that would eventually vanish. Greg graduated from Lynbrook High School in 1972.

**Attending UCLA, "Coming Out" and his Life Partner**

Greg's excellent grades in high school helped secure his admission to UCLA. Greg moved to the Westwood area and engaged in several campus activities. He participated in the crew club and the campus glee club. Greg entrenched himself into the study of Economics on a daily basis.

With the freedom of campus life and a setting where open minded people also lived, Greg started dating openly gay men. There weren't many instances of ridicule or discrimination, but does recall the occasional "queer" comment.

Greg's journey in college reached its end in 1976, when he graduated with a Bachelor of Arts in Economics.  During his final year, he met Larry Duplechan. Larry was a younger student at UCLA and also a participant in the men's glee club. Greg and Larry had an immediate connection.   The relationship evolved quickly. Soon after, Greg and Larry were living together. While Greg's mother was not accepting of his sexual orientation, they were despondent to learn that Greg was living with an African-American man. Greg's relationship with his family grew very cold quickly. His parents wouldn't speak to him and his siblings were distant at best. By Greg's estimation, it took at least 20 years for his family to finally be accepting of Larry.

Over the years, Greg and Larry's relationship blossomed and their commitment to each other remained steadfast. Greg financed Larry's education at UCLA. Following graduation, Larry found his niche in professional life as a legal secretary and the couple purchased their home together in Woodland Hills in 1979. Over the years, they enjoyed traveling, cruising, and vacationing in Palm Springs. They also enjoyed being "uncles" to their nieces and nephews. Greg and Larry dreamed of one day being a married couple. Soon after the recognition of gay marriage in California in 2008, Greg and Larry were married in a civil ceremony in the living room of their home. Greg and Larry both describe that day as a joyous occasion that was very emotional for both of them, as all of their respective family members were present.

While their marriage was a paramount moment in their lives together, the present legal situation, has been an onerous but unifying struggle for both. When James Gregory Harvey is sentenced on March 28, 2016, his husband and life partner of 39 years, Larry  Duplechan, will be in Court wholeheartedly supporting him.

**Greg Harvey a Professional Banker**

While attending UCLA, Greg entered the banking industry. He obtained an entry level bank teller position at the Bank of Los Angeles. That bank was eventually acquired by Crocker National Bank. For the following 15 years, Greg worked in nearly every capacity, including branch manager, senior loan officer, and commercial loan officer.  In approximately 1986, Greg transitioned to City National Bank where he proceeded to climb the executive leadership ladder over the next 25 years. At the time of Greg's voluntary resignation in 2015, he had held the title of *Vice President of Product Solutions and Strategies* for over 10 years. Annual performance reviews reveal that Greg was at the top of his game, consistently meeting the highest standards set forth by his employer.

Mr. Harvey's immediate supervisor, Karen J. Gmunder, shared the following:

> Greg often spoke of how much he enjoyed working at City National
> Bank and on my team. When he resigned from the Bank, he did so on
> his own volition in advance of his plea to this crime so that he would
> not place the Bank at any reputational risk. Upon his resignation, he
> voiced how sorry he was to have committed this crime and how sorry
> he was to disappoint me by leaving his position. I believe Greg's
> resignation from the Bank was one of the hardest acts of his life, but
> reflected his desire to respect the Bank and his professional colleagues
> as well as to begin the reconstruction process of his own life.

Greg Harvey committed his professional life to banking. Following nearly 40 years in the industry, and as a direct result of his illegal conduct, Greg voluntarily resigned from professional banking in mid-2015.

**The Personal Struggles of James Gregory Harvey**

On March 7, 2014, federal agents executed a search warrant at Greg's home in Woodland Hills.

Greg has been viewing adult pornography, since he was in his early 20's. His pornography habits grew over time, especially as it became readily available and free to obtain over the internet.   His use of pornography grew to an addiction, and eventually evolved into criminal conduct by viewing illegal material. Greg realizes that his use of pornography has grown to an unhealthy level and that long term treatment in the future will be necessary to manage and eradicate unhealthy sexual behavior.

A summary of Dr. Lea Chankin's psychosexual evaluation (see Attachment B) makes a variety of favorable findings including his suitability for future treatment in the community:

> Mr. Harvey has a low risk of recidivism for general criminal behavior
> (1%) and current research about child pornography recidivism is also low.
> This combined with Mr. Harvey's strengths; pro-social orientation, stable
> education and employment, stable lifestyle, and stable relationship history

it is my professional opinion that Mr. Harvey's overall risk of recidivism is low. Therefore it is my professional opinion that Mr. Harvey can be managed in the community. He should participate in sex offender specific treatment with a CASOMB ( California Sex Offender Management Board) certified treatment provider.

Mr. Harvey is also under the care of his primary care physician for depression and anxiety, conditions that correlate with the present matter. Also, as a condition of his pretrial release, Mr. Harvey has been attending weekly mental health counseling sessions.

**Character of James "Greg" Harvey**

The following excerpts are provided to the Court from written reference letters in an effort to shed additional light on the character of James "Gregory" Harvey as viewed by friends and family members:

**Michael J. Griffiths, a good friend for over 30 years, shares ...**

I was taken aback when I learned of the charges brought against Greg. He has always been a hard working model citizen, consistently contributing to our society, and with no legal troubles of any kind. He has led a life of integrity and is widely regarded as a man of character and trust worthiness. There is no doubt that this legal situation has had a tremendous impact on Greg. He has told me of his great shame, and the situation has clearly pained and troubled him to his deepest core. His regret is palatable, sincere, and true. It is clear to see that he is a changed man-I believe he would never repeat any related offenses or of any danger to our society.

**Lloyd Duplechan, his brother in-law, implores...**

Admittedly, I was taken aback and in disbelief when I learned the charges Greg faced, because he is such a decent, upstanding individual and the accusation is such a departure from his character. That said, I have made every effort to refrain from judgement as I am privy to the details of the case. I do know that this case is ostensibly weighing very heavily on Greg, and appears to be taking quite a toll. I only hope and pray that Greg's integrity, honesty and kindness weigh into the decisions, and he is given all due consideration and opportunity.

**Ronaldo M. Bowins, another good friend relates...**

> I know that Greg is truly remorseful and takes very seriously what
> now stands before him. He has complied with the advice, and the
> requirements placed on him during this time. He has truly learned
> from this experience and feels badly not only for himself but for his
> family. His family is everything, His relationship with his husband, of
> more than 30 years, is a testament to his loving and caring nature. Their
> relationship stands for many, as a prime example of a life well lived.
> Greg has never been on the wrong side of the law, and I don't see him
> ever being in this position again. He is a great man, who made a grave
> mistake.

Rather than quoting every letter provided on Mr. Harvey's behalf, other letters from his

family and friends are grouped together at Exhibit A.

As often is seen in these cases, a man at a vulnerable time of his life, became drawn to

the taboo of child pornography. Greg's life history reveals that, despite his shortcomings, he

is a beloved, productive citizen who is not a threat to the community and proven capable of

functioning in a law abiding society.

### III.
### FACTS OF THE CASE AND PROCEDURAL BACKGROUND

The following is a summary of the underlying facts of this case as set forth in the plea

agreement. The undersigned has reviewed all reports surrounding the investigation conducted

by case agents.

Following an investigation into peer to peer internet file sharing a search warrant was

requested by the investigating agents. The search warrant request and affidavit was based on

the suspected downloading of underage pornography. Law enforcement was also seeking

evidence that suggested Mr. Harvey was engaged in the seduction of or attempted contact of

minor children. Even though law enforcement sought items such as fantasy diaries, illicit

magazines, production materials, or evidence suggesting child prostitution; no such evidence was located.

During the execution of the warrant, on March 7, 2014, forensic evidence was seized and analyzed by law enforcement.  At Mr. Harvey's residence, case agents seized multiple digital devices that contained approximately 3,000 still images of child pornography. There appears to be no indication that the seized illicit materials were, stored, hidden, or secured with encryption or other types of countermeasures. Case agents seized alleged illicit materials and left the residence.

On August 28, 2015, an Information was filed in the Central District of California charging Mr. Harvey with Possession of Child Pornography.  A summons was issued.  On September 28, 2015, Mr. Harvey appeared before the Honorable Alicia G. Rosenberg, who released him on a $15,000 appearance bond and pretrial supervision. It should be noted Mr. Harvey was not required to wear an electronic monitoring bracelet.

Pursuant to a plea agreement, Mr. Harvey quickly admitted guilt to one count of Possession of Child Pornography, a violation of 18 U.S.C.§2252(a)(5)(B).

Since, Mr. Harvey's initial contact with law enforcement, *over two years ago*, he has been cooperative in every area feasible including; complying with Pretrial Services and all release conditions which includes a mental health program, abstaining from alcohol, restricted internet use, and making all court appearances as scheduled.

Sentencing in this matter is set for March 28, 2016, before this Honorable Court.

## IV.
## THE STATUTORY SENTENCING FACTORS IN 18 U.S.C. U.S.C.§3553(a) REQUIRE A SENTENCE BELOW THE GUIDELINES RANGE

Core principles in sentencing have now been resolved by the Supreme Court in *United*

*States v. Booker,* 125 S. Ct. 738, (2005), *Gall v. United States*, 128 S.Ct. 586, 591 (2007) and *Kimbrough v. United States*, 552 U.S. 85, 128 S.Ct. 558(2007.)

> The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable.
>
> *Nelson v. United States, 129 S.Ct. 890,891 (2009).*

What the Supreme Court has described as the "overarching provision" of 18 U.S.C. § 3553(a) is set forth in that provision's very first sentence – that "the court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in subparagraph (2) of this subsection." *Kimbrough v. United States, 128 S. Ct. at 570 (2007).* This description by the Supreme Court makes clear that this "parsimony principle" is not mere precatory language, but is a key – in fact, *the* key – requirement that a sentence must satisfy. Thus, factors justifying a sentence outside the guideline *are no longer required to be "extraordinary." Gall, 168 S.Ct. at 595.*

> Congress could not have been clearer in directing that no limitation ... be placed on the information concerning the background, character, and conduct of a defendant that a district court may receive and consider for the purpose of imposing an appropriate sentence...Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant."
> *Pepper, 131 S.Ct at 1240.*

Thus, the challenge in this case, as in other cases involving child pornography, is to determine a fair sentence that is sufficient, but not greater than necessary. A sentence that is too severe is unjust, and therefore, also fails to promote respect for and confidence in the law.

Here, in the case of James Harvey, the sentence which is sufficient, but not greater than

necessary, is far less than the astounding guideline range of 97 to 120 months the probation

office has calculated. Rather, when examining Mr. Harvey's life, and the underlying aberrant

behavior,  which does not involve the creation or *knowing* distribution of pornography or abuse

of minor children– a mitigated custodial sentence with the most stringent supervision

conditions such as sexual offender registration, and mental health treatment is more than

appropriate. Application of the §3553(a) factors demonstrates this.

## A. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE (*18 U.S.C.§ 3553(a)(1)*)

The child pornography offense related to James Harvey, is a fairly typical one; though

it involves the use of a computer and possession of a moderate number of images, some of

which may involve prepubescent minors and are treated as sadistic under the case law, that is

true of the vast majority of child pornography offenses in this computer age. And while such

possession of child pornography is certainly a serious offense, it is serious not so much for the

direct conduct of possession but for the market it creates for those who actually willfully

distribute images, produce the child pornography, and abuse children in the process. The

possession offense falls at the lowest end of the continuum of sex offenses. It is less serious

than distribution of child pornography. It is less serious than production of child pornography.

and it is less serious than the actual molestation of children. As the court articulated it in

*United States v. Baird, 580 F. Supp. 2d 889 (D.Neb. 2008):*

> It is clear that one possessing child pornography has far less
> culpability that one distributing pornography, who, in turn, has
> far less culpability than one who produces child pornography.
> The greater culpability of an actual predator or abuser should be
> reflected in a sentence that greatly exceeds the punishment for the
> exploitative crimes that do not involve acts of abuse by a defendant.

The Third Circuit has offered an important caution when considering child pornography

offense conduct:

1

> It has often been stated that possession and distribution of child porno-
> graphy are very serious crimes that have a terrible impact on real victims.
> No one could sincerely disagree with that statement, and the seriousness
> of the crimes is reflected in the penalties that Congress has prescribed as
> well as in the Guidelines that are promulgated by the Sentencing Commission.
> However, revulsion over these crimes cannot blind us as jurists to the indi-
> vidual circumstances of the offenders who commit them.

> *United States v. Olhovsky, 562 F.3d 530, 552 (3rd Cir. 2009)*

**B. THE PURPOSES OF SENTENCING** *(18 U.S.C. § 3553(a)(2))*
<u>**The Seriousness of the Offense and Promoting Respect for the Law, and Just Punishment**</u>
<u>*(18 U.S.C. § 3553(a)(2)(A))*</u>.

Promoting respect for the law means more than merely doling out harsh punishment.

As noted by the Supreme Court in *Gall v. United States, 128 S. Ct at 599*, an overly harsh

sentence "may work to promote not respect, but derision of the law if the law is viewed as

merely a means to dispense harsh punishment without taking into account the real conduct and

circumstances involved in sentencing." And as explained by the Third Circuit with respect to

child pornography sentences in particular:

> The hideous nature of an offender's conduct must not drive us to
> forget that it is not *severe* punishment that promotes respect for
> the law, it is *appropriate* punishment. Although there are clearly
> times when anything less than severe punishment undermines respect
> for the law, it is just as certain that unduly severe punishment can
> negatively affect the public's attitude toward the law and toward the
> criminal justice system. It is no doubt partly for that reason that
> jurists have referred to the responsibility of sentencing as "daunting."
> The power and responsibility of a sentencing court is, indeed, nothing
> short of "daunting." It requires a careful balancing of societal and
> individual needs, and an ability to determine a sentence based on
> dispassionate analysis of those often competing concerns.

> *United States v. Olhovsky, 562 F.3d 530, 551-52 (3rd Cir. 2009)*

These child pornography cases, however have become especially difficult at sentencing as judges must determine punishment by striking a balance between punitive measures appropriate for those defendants who produce the disgusting images, or distribute them for profit, and those defendants, like Mr. Harvey, who have no previous criminal history and have been an otherwise productive member of society.

**Just Punishment** *(18 U.S.C. § 3553(a)(2)(A))*

The child pornography guidelines are unique to the extent that they have been so grossly increased in just recent years. As a result of the Protect Act, which was passed by Congress in April, 2003, the Guidelines added a greater base offense level; an enhancement for material portraying sadistic conduct, which can include any sexual intercourse with a prepubescent minor; and additional enhancements for larger quantities of images, and enhancements for using file sharing software as "distribution" with no need for the overt act of distribution to be an actual element of the offense. Also according to the Guidelines, each video file containing child pornography is the equivalent of 75 images. *USSG § 2G2.2App. Note 4(B)(ii)*. The impact on Mr. Harvey's potential sentence is astronomical. The attempt to quantify images and videos with arbitrary numbers in an effort increase penalties is perhaps the most glaring example of where the guidelines do not correlate with present day technology, resulting in the gross over statement of an offenders conduct. Would Mr. Harvey be viewed as a less dangerous offender if he only possessed 599 images? As seen in the underlying matter, the effect of these enhancements on Mr. Harvey is to make his calculated guideline guide line exposure range significantly more than it would have been under the 2002 guidelines. With no empirical evidence to support how these increased guidelines support the purpose of sentencing, it suggests, at the very least, that political forces, rather than analytical analysis,

have entered the fray as to what constitutes "just punishment."

**Deterrence** *(18 U.S.C. § 3553(a)(2)(B))*

There are two types of deterrence for the Court to consider – general deterrence, i.e., deterrence of others, and specific deterrence, i.e., deterrence of Mr. Harvey. As to the first, at least some courts have questioned whether child pornography sentences can accomplish general deterrence. As the court in *United States v. Beiermann*, 599 F. Supp. 2d 1087 (N.D. Iowa 2009) opined:

> While the public's outcry for harsher sentences in child pornography cases is certainly understandable, there is not a single sliver of evidence in this sentencing record remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet. From the rapid growth of these cases that my colleagues around the country and I are seeing, we cannot sentence Internet users and sharers of child pornography fast enough for long enough to make a dent in the availability of such material on the Internet. This does not mean that the defendant should not receive a lengthy sentence for his criminal conduct, but it does mean that the sentence should not be longer simply to satisfy an objective that, while laudable, is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of.

It is also must be noted that scientific studies regarding deterrence suggest that it is the *fact* of a sentence, not its length, that has a deterrent impact.[3] This would seem particularly true in the case of child pornography offenders, like Mr. Harvey, who are usually first time offenders who have never been to prison before, and who feel punished not just by incarceration but also by the social embarrassment, the ongoing label resulting from having to register as a sex offender, and the continuing intrusion into their lives created by the supervised release which follows any term of imprisonment.

As to specific deterrence, the Court can be very sure that Mr. Harvey has learned a

---

[3] Kleck, et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623,653 (2005)

lesson and will never do anything like this again. As one district court articulated with respect to the defendant before it in that case:

> [The defendant] has been the symbol of how society will treat someone who accesses child pornography on the Internet. For this middle-class white collar professional, educated, suburban husband and father, the thought of one day in prison is horrifying, particularly given the offense of conviction. Any prison sentence . . . accomplishes specific and general deterrence.

*United States v. Grober*, (D.N.J. 2008) (3d Cir. 2010).

**The Need to Protect Society *(18 U.S.C. § 3553(a)(2)(B))***

One initial factor to consider in evaluating the need to protect society, in this particular case, is that child pornography offenders generally have a low risk of recidivism.[4] This is particularly true in the case of Mr. Harvey, as evidenced by the application of a risk assessment tool.

The Static 99 has been widely adopted as a measure of sex offense recidivism risk. It is recommended for screening and management of sexual offenders to assess long term potential for sexual and violent recidivism. This same assessment tool is presently used by both United States Probation during the course of supervision and in custody Sex Offender Management programs administered by the Bureau of Prisons. When the static 99 risk assessment tool applied to Mr. Harvey, he scored a -3. This placed him in the lowest possible range of potential recidivism at a rate of 1.9%. (Exhibit B).

Mr. Harvey has also undergone a psychosexual assessment by Dr. Lea Chankin, Ph.D.. A copy of the report is appended. As corroborated by Dr. Chankin, James Harvey does not pose as a significant risk of recidivism.

---

[4] *Sex Offenders: Recidivism and Collateral Consequences, Tweksbury R., Zboga, K., et al:Report for National Institute of Justice, March 2012*

Although the probation office, the government, and the Court are now all familiar with this offense as child pornography prosecutions have become much more common place in the federal system, none of these parties is an expert on whether James Harvey constitutes a risk to children in the future – in some ways, the most important factor for sentencing. However the evaluation of Dr. Chankin, a true expert, supports a mitigated custodial sentence, followed by an appropriate term of supervised release.

Other relevant factors in protecting society that the sentencing guidelines related to child pornography offenses, *did not take into consideration when promulgated are:*

- Lifetime Supervised Release is now available, as of 2004

- Stringent and behavior related supervised release conditions and strict supervision policies such as sex offender treatment, search, polygraph, surveillance and increased contacts in the community are now all standardized by the Administrative Office of the United States Courts for federal probation officers, as of 2011

- Sexual Offender Registration and Notification Act (SORNA) as of 2006, requiring the registration of all sexual offenders

- Sexually Dangerous Person Designation, as of 2006, thus exposing repeat offenders to potential civil commitment

## C. THE ADVISORY GUIDELINES AND POLICY STATEMENTS *(18 U.S.C. § 3553(a)(4),(5))*

The fact of the matter is that child pornography sentencing guidelines are among those most frequently varied from. There are multiple reasons for this.

First, many, if not most, of the child pornography guideline enhancements are of questionable significance. The most basic problem is that most of the enhancements – including in particular the maximum number of images, use of a computer, presence of images of prepubescent minors, and sado-masochistic content – apply in every or almost every case. As one district court summarized testimony on the question given by a government agent:

> SA Chase is the veteran of 100,000 images from 180 collections. In her testimony, SA Chase recognized that *every one* of her 180 investigations involved a possessor with 600 or more images. SA Chase testified that *every one* of the cases she had worked on – "100 per cent" – "involved the use of a computer and of interactive computer service." Further, according to SA Chase, "all" of the cases she has worked on involved images of prepubescent minors under age 12, either posing or engaged in sexual activity. Even a vast majority – "80 per cent" – had at least one image and video depicting sadomaso-chistic content.

*United States v. Grober, 624 F. 3d 592,597 (3rd Cir.2010)*

Secondly, these various enhancements operate exponentially. With a base offense level of 18, Mr. Harvey's exposure is also exponentially increased. Here the specific offense characteristics add *15 levels* and sky rocket his base offense level guideline range from 27-33 months (level 18) to 135-168 months (unadjusted level 33).

Third, and more generally, the child pornography guideline, like the drug guideline considered by the Supreme Court in *Kimbrough v. United States*, is not a result of "the Commission's exercise of its characteristic institutional role" of making "'determinations based on empirical data and national experience, guided by a professional staff with appropriate expertise,'" which, at least ideally, lead to "a sentencing range that will 'reflect a rough approximation of sentences that might achieve §3553(a)'s objectives.'"

Given all of this, the overly punitive child pornography guideline is probably entitled to less weight than any other guidelines. This is reflected in the frequency with which courts across the country have varied from the guidelines.

## The National Landscape of Sentencing in Child Pornography Cases

Possessing, receiving, and trafficking child pornography are serious federal crimes that deserve punishment. However, federal penalties for child pornography offenses have risen ever higher, driven by politics and revulsion rather than justice and empirical evidence.

In a critical article in *The Champion* magazine, former senator Arlen Specter and Linda Dale Hoffa noted that between 1987 and 2009 Congress prompted revisions of the guidelines nine times and each time the changes resulted in longer sentences.[5] Increasingly long sentences are designed to make us feel better rather than make us safer or promote rehabilitation.

In 2012, the United States Sentencing Commission submitted to Congress an analysis on Child Pornography penalties. In preparation for the report, the Commission reviewed he most current social science, case law, and legislation concerning child pornography offenses and conducted extensive data analyses of several thousand federal child pornography cases. It also sought the views of experts in technology and the social sciences, treatment providers, law enforcement officials, legal practitioners, victims' advocates, and members of the judiciary.

In a press release dated February 27, 2013, Judge Patti B. Saris, chair of the Commission, concluded:

> Because of changes in the use of Internet-based technologies,
> the existing penalty structure is in need of revision. Child porn-
> ography offenders engage in a variety of behaviors reflecting diff-
> erent degrees of culpability and sexual dangerousness that are not
> currently accounted for in the guidelines…The Commission will
> continue to study child pornography sentencing practices, and looks
> forward to working with Congress on developing a sentencing scheme
> that serves to better distinguish offenders, thereby reducing unwarranted
> sentencing disparities in these serious crimes.

In response to the Commission Report on Child Pornography, the United States Department of Justice agreed with many of the findings outlined. In a letter  addressed to the Sentencing Commission and dated March 5, 2013, Anne Gannon, USDOJ National Coordinator for Child Exploitation Prevention and Interdiction concurred as follows:

---

[5] Senator Arlen Specter & Linda Dale Hoffa, *A Quiet but Growing Judicial Rebellion Against Harsh Sentences for Child Pornography Offenses – Should the laws be changed?*, THE CHAMPION MAGAZINE, Oct. 2011, at 12; *see alsogenerally* THE HISTORY OF THE CHILD PORNOGRAPHY GUIDELINES (describing the nine guideline alterations).

> And the Department agrees with the Commission's conclusion that advancements in technology and the evolution of the child pornography "market" have led to a significantly changed landscape-one that is no longer adequately represented by the existing sentencing guidelines. Specifically, we agree with Report's conclusion that the existing Specific Offense Characteristics ("SOC's) in USSG §2G2.2 may not accurately reflect the seriousness of an offender's conduct, nor fairly account for differing degrees of offender dangerousness. The current guidelines can at times under-represent and at times over-represent the seriousness of an offender's conduct and the danger an offender poses.

In the history of this country, when the legislature has lost its way in assessing what is fair, it has been the judiciary who is ultimately the voice of reason and moderation. The defendant and his family asks the Court to act similarly in this case; and sentence James Harvey, a first time offender, to a mitigated custodial sanction with an appropriate term of supervised release.

## V.
## CONCLUSION

James "Greg" Harvey is before the Court for sentencing. He has entered a guilty plea to Possession of Child Pornography, after being found in possession of a moderate number of underage and illegal pornography images. Mr. Harvey is truly ashamed and embarrassed of his behavior. Nevertheless he stands before the Court and requests compassion and understanding.

Mr. Harvey is not a prowling pedophile, sophisticated hoarder of images, or distributor of child pornography for whom the stiff guidelines were intended. He is a first time offender who with continued counseling, is not likely to become a repeat offender, which has been corroborated by a validated, widely used risk assessment tool and comprehensive psychosexual evaluation.

Further Mr. Harvey must register as a sex offender in any community where he lives and works. In some jurisdictions, such as California, sex offenders must register for life. Thus a

sentence below the advisory Guidelines should not be interpreted as leniency. Mr. Harvey will live with the stigma of his conviction for the remainder of his life; a stigma that will dictate where he can live, work, or recreate.

James "Greg" Harvey, has many personal challenges at the moment, but nevertheless he is ready to accept responsibility for his actions and move forward with his life. To that end, it is clear that leniency and compassion will be the vehicle that will return Mr. Harvey, a first time offender, to the continued path of law-abiding citizenship.  This sentiment was inferred by former Attorney General Eric Holder in his comments made to the ABA House of Delegates on August 21, 2013 "...too many Americans go to too many prisons for far too long, and for no truly good law enforcement reason."

A guideline sentence of 97 months is not necessary in this case in light of Mr. Harvey's stellar background. A mitigated custodial sentence, of 12 months and 1 day coupled with an appropriate and intensive period of supervised release which is also a "substantial restriction of freedom," *Gall v. United States*, (2007)[6] – is more  than sufficient to constitute just and fair punishment. This is especially compelling in light of the fact that it is demonstratively evident that James Harvey does not pose potential danger to minor children.

It is respectfully requested that the Court grant a variance in this matter and impose a custodial sentence of 12 months and 1 day, followed by an appropriate term of supervised release.

---

[6] *This is especially true in the case of a child pornography offender, because the conditions imposed on such offenders are usually significantly more intrusive and demanding. In May of 2011, the Administrative Office of United States Courts issued national policy to federal probation officers outlining appropriate procedures in the community supervision of child pornography offenders. In addition, child pornography offenders must register as sex offenders and carry that public brand.*

1

Respectfully Submitted,

2 Dated: 3/15/16

3

4

5 John J. Duran
Attorney for James G. Harvey

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28